In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1944

SUSIE BIGGER,

*Plaintiff-Appellee,*

*v.*

FACEBOOK, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-7753 — **Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 27, 2019 — DECIDED JANUARY 24, 2020

Before WOOD, *Chief Judge*, and KANNE and BARRETT, *Circuit Judges.*

KANNE, *Circuit Judge.* The Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), requires employers to pay overtime wages to certain employees, *see id.* §§ 207(a), 213. For enforcement, the Act allows employees to sue their employer for damages and to bring the action on behalf of themselves and other "similarly situated" employees,

*id.* § 216(b), who may join the so-called "collective action."[1] The court overseeing the action has discretion to authorize the sending of notice to potential plaintiffs, informing them of the opportunity to opt in. *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170–71 (1989). But the court must respect judicial neutrality and avoid even the appearance of endorsing the action's merits. *Id.* at 174.

This case presents the question whether a court may authorize notice to individuals who allegedly entered mutual arbitration agreements, waiving their right to join the action.

Facebook employee Susie Bigger sued Facebook for violations of the FLSA overtime-pay requirements. She brought the action on behalf of herself and all other similarly situated employees. The district court authorized notice of the action to be sent to the entire group of employees Bigger proposed. Facebook argued this authorization was improper because many of the proposed notice recipients had entered arbitration agreements precluding them from joining the action. Facebook also argued the court's authorization of notice was improper because Facebook is entitled to summary judgment.

We hold that when a defendant opposing the issuance of notice alleges that proposed recipients entered arbitration agreements waiving the right to participate in the action, a court may authorize notice to those individuals unless (1) no plaintiff contests the existence or validity of the alleged

---

[1] Collective actions are similar to class actions governed by Federal Rule of Civil Procedure 23. But a principal distinction is that members of a collective must opt in to the action to be bound by the judgment or settlement, whereas members of a Rule-23 class must opt out not to be bound. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771–72 (7th Cir. 2013).

arbitration agreements, or (2) after the court allows discovery on the alleged agreements' existence and validity, the defendant establishes by a preponderance of the evidence the existence of a valid arbitration agreement for each employee it seeks to exclude from receiving notice.

Because the district court here did not apply this framework, we vacate the court's order issuing notice and we remand for the court to apply the proper standard. We also affirm the court's denial of summary judgment to Facebook.

## I. BACKGROUND

Facebook generates revenue by selling advertisements on its electronic platforms. To help clients navigate various advertising options—which Facebook calls "solutions" to client objectives—Facebook employs "sales teams, or 'pods.'" Sales pods are made up of managers; "Client Partners"; and "Client Solutions Managers," or "CSMs."

Susie Bigger was a CSM. The CSM role was created by merging two positions: one focusing on "analytical work" (looking at data to make advertising recommendations), and the other focusing on "upselling" (increasing advertisement sales to existing clients).

Facebook categorizes all CSMs into numbered "Individual Contributor," or "IC," levels based on the experience and expectations involved in each CSM position. CSMs in levels 1 and 2 are deemed eligible for overtime pay, while CSMs in levels 3 and higher are deemed overtime ineligible.

Bigger was a level-4 CSM; when she worked over 40 hours in a week, she did not receive overtime compensation. In 2017, she brought an action against Facebook on behalf of herself and all other similarly situated employees. She claimed that,

by not paying them overtime wages, Facebook violated the FLSA.[2]

After Bigger and Facebook engaged in some (but not complete) discovery, Bigger moved to conditionally certify a collective action, and asked the court to authorize notice to all members of the putative collective: "[a]ll individuals who were employed by Facebook as Client Solutions Managers at level IC-3 or IC-4 at any location in the United States" during the period three years before conditional certification to the present. The notice would inform recipients about the action and opportunity to opt in.

Facebook responded in two ways. First, it moved for summary judgment, arguing that Bigger—the only plaintiff at this point—was exempt from the FLSA overtime-pay requirements. Second, it argued that the authorization of notice was improper because most proposed recipients had entered mutual arbitration agreements making them ineligible to join the action.

In support of its opposition to the notice, Facebook supplied the district court with two templates of arbitration agreements: copies of arbitration-agreement forms that Facebook had given to two employees, whose names and signatures were redacted. Facebook also gave estimates about how many proposed notice recipients had signed comparable

---

[2] Bigger also brought a state-law claim against Facebook, alleging violations of the Illinois Minimum Wage Law, 820 ILCS § 105/1 *et seq.* That claim is not part of this appeal.

forms.[3] But Facebook did not supply the actual documents that proposed recipients allegedly executed. Nor did Facebook otherwise show which proposed notice recipients entered mutual arbitration agreements.

The district court denied Facebook's motion for summary judgment, and—conditionally certifying the proposed collective—authorized notice to be sent to all employees in the group Bigger proposed. Facebook sought and was granted interlocutory appeal of these decisions.[4] *See* 28 U.S.C. § 1292(b).

## II. ANALYSIS

We begin with Facebook's argument that the district court abused its discretion by authorizing notice to all members of the proposed collective. We then turn to Facebook's argument that the court improperly denied Facebook summary judgment.

### A. Authorization of Notice

We review a district court's management of a collective action—including the facilitation of notice—for abuse of

---

[3] Facebook initially estimated that "[a]t least 252 CSMs employed at IC levels 3 or 4" between October 2014 and December 2018 had entered an arbitration agreement. This, Facebook said, amounted to "more than half of the CSMs employed at IC levels 3 or 4" during that timeframe. Four months later, Facebook updated its estimate. It said that "at least 336 of the 428 CSMs employed at IC levels 3 or 4" between November 29, 2015 and April 8, 2019 had entered an arbitration agreement, amounting to "approximately 78% of the CSMs employed at IC levels 3 or 4" during that period.

[4] The trial court also denied Bigger's requests to post the notice in Facebook's offices and to send a reminder notice. Those decisions are not part of this appeal.

discretion. *See Hoffmann–La Roche*, 493 U.S. at 169; *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010). In doing so, we review *de novo* legal conclusions underlying the court's decision. *See Weil v. Metal Techs., Inc.*, 925 F.3d 352, 357 (7th Cir. 2019).

Arguing that the court abused its discretion by authorizing notice to the proposed group of employees, Facebook gives the following reasoning: Most employees in the group entered arbitration agreements waiving their right to participate in the action. Those agreements make the employees who entered them neither "potential plaintiffs" nor "similarly situated" to Bigger. Thus, the notice would misinform most recipients—by indicating that they may join the action when, in truth, they may not—and the notice would unfairly amplify settlement pressure.

Bigger responds that all employees in the proposed collective are "potential plaintiffs" because they, along with Bigger, "were victims of a common policy or plan that violated the law." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (quoting *Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 261 (S.D.N.Y. 1997)). She points out that the district court can determine later, after more discovery, whether anyone who opts in is not "similarly situated" to Bigger. She continues that the notice would not misinform recipients, because it says, "[i]f you file an 'Opt-In Consent Form,' your continued right to participate in this suit may depend upon a later decision by the Court that you and the Named Plaintiff are actually 'similarly situated' in accordance with federal law." Besides, she adds, Facebook did not propose changes to the notice.

The question we face is whether a court may authorize notice to individuals who, according to the defendant, entered

valid arbitration agreements waiving their right to join the action. In addressing this issue of first impression for our court, we find guidance in the goals and dangers of collective actions and in the neutrality a trial court must maintain when facilitating notice to potential plaintiffs.

The twin goals of collective actions are enforcement and efficiency: enforcement of the FLSA, by preventing violations of the overtime-pay requirements and by enabling employees to pool resources when seeking redress for violations; and efficiency in the resolution of disputes, by resolving in a single action common issues arising from the same alleged illegal activity. *Cf. Hoffmann–La Roche*, 493 U.S. at 170–71. The FLSA invokes these goals by explicitly permitting collective actions in which "similarly situated" employees may join a lawsuit against their employer.[5] 29 U.S.C. § 216(b).

But collective actions also present dangers. *Hoffmann–La Roche*, 493 U.S. at 171. One is the opportunity for abuse of the collective-action device: plaintiffs may wield the collective-action format for settlement leverage. *See id.* Generally speaking, expanding the litigation with additional plaintiffs increases pressure to settle, no matter the action's merits. A related danger is that notice giving, in certain circumstances, may become indistinguishable from the solicitation of claims—which

---

[5] Some courts, including the district court here, use a two-stage procedure for determining whether individuals are "similarly situated" to the named plaintiff(s). *See, e.g., Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010). *See generally Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001) (describing three approaches). We have not required this two-stage approach, nor do we do so now. Our focus is limited to the scope of a court's discretion in facilitating notice of an FLSA action to certain employees.

is a process "distinguishable in form and function" from court intervention in the notice process for case management purposes. *Id.* at 174.

To counter these dangers, trial courts have discretion to monitor the preparation and distribution of notice to "potential plaintiffs," *id.* at 169, who may opt in to the action. *Id.* at 171. But courts "must be scrupulous to respect judicial neutrality," avoiding even the appearance of endorsing the action's merits. *Id.* at 174.

Given these considerations, we conclude that a court may not authorize notice to individuals whom the court has been shown entered mutual arbitration agreements waiving their right to join the action. And the court must give the defendant an opportunity to make that showing.

The goal of efficiency neither favors nor disfavors this result. As a general matter, it may be efficient to first send notice to a group of people and then weed out those who opt in but are in fact ineligible to join. But in the specific situation where the court has been shown certain individuals may not join the action, it may be *in*efficient to send notice to those people— because the notice may serve only to prompt futile attempts at joinder or the assertion of claims outside the collective proceeding.

Even if efficiency favors sending notice to individuals who entered arbitration agreements, efficiency cannot override the court's obligations to maintain neutrality and to shield against abuse of the collective-action device.

These obligations become prominent when the employer alleges that proposed notice recipients entered arbitration agreements. This is because, if the defendant provides

proof—or is denied the opportunity to provide proof—that "arbitration employees" are among the proposed notice recipients, then sending notice to those individuals may at least appear to predominantly inflate settlement pressure instead of inform employees of an action in which they can resolve common issues. Also, in that situation, the risk is high that the notice will appear to facilitate abuse of the collective-action device and thus place a judicial thumb on the plaintiff's side of the case.

For these reasons, when a defendant opposes the issuance of notice by asserting that proposed notice recipients entered mutual arbitration agreements, the trial court must take specific steps:

First, the court must determine whether a plaintiff contests the defendant's assertions about the existence of valid arbitration agreements entered by proposed notice recipients.

If no plaintiff contests those assertions, then the court may not authorize notice to the employees whom the defendant alleges entered valid arbitration agreements.

But if a plaintiff contests the defendant's assertions, then—before authorizing notice to the alleged "arbitration employees"—the court must permit the parties to submit additional evidence on the agreements' existence and validity. The employer seeking to exclude employees from receiving notice has the burden to show, by a preponderance of the evidence, the existence of a valid arbitration agreement for each employee it seeks to exclude from receiving notice. *Cf. In re JPMorgan Chase & Co.*, 916 F.3d 494, 502–03 (5th Cir. 2019). The court may not authorize notice to any employee whom the employer shows entered a valid arbitration agreement, unless

the record reveals that nothing in the agreement would prohibit that employee from participating in the action.[6] *See id.* at 501. To be clear, if the employer does not prove that an employee entered a valid arbitration agreement, then the court may authorize notice to that employee—granted, of course, that the employee is otherwise an appropriate notice recipient.

Importantly, requiring a defendant to show the existence and validity of an arbitration agreement for each employee it seeks to exclude from receiving notice does not run against the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Under that policy, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *id.* at 24–25. The policy does not require courts to simply take an employer at its word when it says certain employees entered valid arbitration agreements. After all, determining whether a valid arbitration agreement exists is generally within the court's authority. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019) (recognizing presumption that judges are authorized "to resolve certain 'gateway' questions, such as 'whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy" (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (plurality opinion))); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (recognizing that, when deciding whether the parties

---

[6] Even without notice, employees who entered valid arbitration agreements may try opting in. If they do, the employer may move to compel arbitration to exclude those employees from the action.

agreed to arbitrate, courts generally should apply ordinary state-law principles governing the formation of contracts).

Because we only now provide this analytical framework, the parties could not navigate its demands. And the district court could not—and did not—apply the correct standard, resulting in an abuse of discretion. We therefore vacate the order authorizing notice, and remand for the district court to take the steps we've prescribed. Specifically, the court on remand should allow the parties to submit additional evidence on the existence of valid arbitration agreements between Facebook and proposed notice recipients.[7] If Facebook proves that certain proposed recipients entered valid arbitration agreements waiving their right to join the action, or if Bigger does not contest that those employees entered such agreements, the court may not authorize notice to those employees.

Although this resolves the parties' disagreement over the court's discretion to authorize notice in the face of alleged arbitration agreements, it does not entirely resolve this appeal. The reason is Facebook's other argument—that, even if no proposed notice recipients entered arbitration agreements, notice should not be sent to any employees, because Facebook is entitled to summary judgment. Indeed, if Bigger, as the sole plaintiff, lacks a viable claim against Facebook, then the action cannot proceed. So, we determine next whether the district

---

[7] We note that, unlike the plaintiffs in the Fifth Circuit's case, *In re JPMorgan Chase & Co.*, Bigger did not yield to Facebook's assertions about the existence and validity of the alleged arbitration agreements. *Cf.* 916 F.3d at 498 (observing that plaintiffs represented they did not intend to contest the existence, validity, or enforceability of arbitration agreements entered by proposed notice recipients).

court erred by denying Facebook's motion for summary judgment.

*B.  Summary Judgment*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). We review a district court's denial of summary judgment *de novo*, viewing the facts in the light most favorable to the non-movant—here, Bigger—and drawing all reasonable inferences in that party's favor. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012).

Facebook contends that there are no genuine issues of fact material to whether Bigger is exempt from the FLSA overtime-pay requirements.

The FLSA exempts many categories of employees from obligated overtime wages. *See* 29 U.S.C. § 213. These exemptions must be given a fair, not a narrow, reading. *Encino Motocars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

The exemption Facebook relies on is the "administrative exemption," which covers employees who are "employed in a bona fide … administrative … capacity." 29 U.S.C. § 213(a)(1). An agency regulation explains that this exemption applies to any employee:

    (1)  Compensated on a salary or fee basis … at a rate [not less than the amount specified by regulation] …;

    (2)  Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). Applying this regulation requires "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer–LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012). And the employer asserting that the exemption applies ordinarily must show that the employee's work satisfies all three criteria.

But another regulation provides a less rigorous alternative: if the employer shows that the employee is highly compensated—that is, receives total annual compensation exceeding an amount specified by regulation—then the employer need only additionally show that the employee "customarily and regularly performs any one or more of the exempt duties or responsibilities of an … administrative … employee." 29 C.F.R. § 541.601(a). The rationale for this highly-compensated-employee test is that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* § 541.601(c).

The parties agree that Bigger was highly compensated, invoking the less stringent test. They also accept that "customarily and regularly" means "a frequency that must be greater than occasional but … may be less than constant." 29 C.F.R. § 541.701. They dispute whether Bigger customarily and regularly performed administratively exempt duties, which are "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," *id.* § 541.200(a)(2),

and "the exercise of discretion and independent judgment with respect to matters of significance," *id.* § 541.200(a)(3).[8]

We agree with Bigger that factual issues remain concerning the extent to which she engaged in exempt duties. We'll begin with the "directly related" variety of exempt administrative duties, then turn to the "discretion and independent judgment" kind.

*1. Duties "Directly Related to Management or General Business Operations"*

Agency regulations indicate that, for the "directly related" criterion to be satisfied, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

The regulations provide a list of functional areas in which this kind of work is often performed. The list includes tax; finance; quality control; purchasing; advertising; marketing; research; human resources; public and government relations; and others. *See* 29 C.F.R. § 541.201(b). The regulations also say that "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." *Id.* § 541.201(c).

Facebook argues that Bigger is exempt under the "directly related" standard because her work customarily and

---

[8] The parties do not challenge the relevant agency regulations' validity or meaning, only their application. Because the regulations' interpretation is not in question, our task here is simply to determine whether, applying the regulations, Bigger falls under the FLSA's administrative exemption as a matter of law. *Cf. Schaefer–LaRose*, 679 F.3d at 572 n.20.

regularly fell under functional areas listed above, such as advertising and marketing, and she served as a consultant to Facebook's clients and as an intermediary between clients and Facebook's internal teams.

While Bigger did work in the advertising industry as a general matter, decisions from our court and a sister court underscore that whether an employee's work meets the "directly related" standard depends on the precise nature of the employee's work. Four cases, in particular, illustrate that whether a duty is exempt may turn on the enterprise's core function—that is, the central revenue generator—and the employee's involvement in it. For example, if the employer's core function is the sale of certain products or services, then simply selling the product or service may not be directly related to the general business operations or management of the employer or its customers.

To start, in *Blanchar v. Standard Ins. Co.*, we determined that an insurance-company employee's duties satisfied the "directly related" standard. 736 F.3d 753 (7th Cir. 2013). We reasoned that the employee "did not directly engage in the sales" of any insurance plans. *Id.* at 757; *see also* 29 C.F.R. § 541.203(b). Instead, the employee "merely assisted salespeople with those sales"—for example, by training salespeople and educating firms about insurance plans. *Blanchar*, 736 F.3d at 757.

Similarly, in *Schaefer–LaRose v. Eli Lilly & Co.*, we determined that pharmaceutical sales representatives' duties satisfied the "directly related" standard. 679 F.3d at 574–77. We reasoned that the core function of the employer was "the development and production of pharmaceutical products"; that the representatives' work supported that core function but

was distinct from it; and that the representatives did not make individual sales. *Id.* at 574–77.

In the same vein, in *Verkuilen v. MediaBank, LLC*, we identified an employee who was "a picture perfect example of a worker for whom the Act's overtime provision is not intended": an account manager for a software-development company. 646 F.3d 979, 981–82 (7th Cir. 2011). As the intermediary between the employer's software developers and the client advertising agencies, the account manager learned the customers' businesses, translated customers' needs into specifications that the developers would implement in the software, trained customers' staff how to use the software, and showed customers how to resolve issues with the software. *Id.* Critically, the account manager was "not a salesman" for an electronics store, nor was she a technician fielding customers' phone calls. *Id.* at 982.

Finally, consistent with these decisions, the Second Circuit in *Reiseck v. Universal Communications of Miami, Inc.* determined that an employee of a free-magazine publisher performed work that did not satisfy the "directly related" standard. 591 F.3d 101 (2d Cir. 2010), *abrogated in part by Encino*, 138 S. Ct. at 1142; *see Schaefer–LaRose*, 679 F.3d at 575 n.23 (distinguishing *Reiseck*). There, the sale of advertising space was the company's crucial revenue generator. *Id.* at 106. And the employee's duty "to sell specific advertising space to clients" did not qualify as administratively-exempt work. *Id.* at 107.

These cases highlight two related principles driving our decision that summary judgment is inappropriate here. First, while duties supporting an enterprise's core function may qualify as an administratively exempt duty, actually engaging in that core function may not. And second, for us to decide

as a matter of law that an employee customarily and regularly performed duties "directly related to management or general business operations," 29 C.F.R. § 541.201(b), we need a clear factual picture of those duties, including how they relate to the employer's and customers' enterprises.[9]

Here, the record does not present a clear picture of Bigger's duties and how they relate to Facebook's and its customers' enterprises.

Facebook's core function—that is, its primary revenue generator—is the sale of advertisements on its electronic platforms. Although Bigger regularly presented advertisement "solutions" to clients, the evidence in the record does not establish whether, outside of making direct sales, Bigger's work customarily and regularly supported Facebook's general sales efforts or its customers' general business operations or management—for example, by performing analytical consultations with customers or by serving as an intermediary between customers and product developers.

It is undisputed that the CSM position merged two roles: one focusing more on giving customers recommendations and one focusing more on making sales. But the submitted evidence obscures the extent to which Bigger performed analytical, consultation work as opposed to salesperson work. For example, Facebook's witness explained that CSMs are expected to "understand the client's business objectives" so they

---

[9] Although the cases we discuss here preceded the Supreme Court's *Encino* decision (holding that FLSA exemptions should be construed fairly rather than narrowly), whether duties are exempt under the "directly related" standard still depends on the precise nature of the employee's work—a proposition that the cases illustrate.

can recommend options from Facebook's "suite of solutions" and "grow [the client's] business." But the witness also explained that all CSMs have sales quotas and are "responsible for sales with existing clients and [for] identifying growth and upsell opportunities." If there is a distinction between "growing the client's business" and selling advertisements to clients, the record does not reveal what that distinction is or how Bigger's duties differed for each of those functions.

A factual issue also remains concerning the extent to which Bigger served as an intermediary between customers and Facebook's product developers. Bigger explained that she was sometimes a "conduit" or "playing messenger" between clients, client partners, and internal Facebook teams. But she emphasized that she "was not creating the solutions" for clients, only relaying information and selecting from repositories of preexisting materials. At bottom, there is a genuine dispute about whether Bigger's interactions with product developers and customers regularly supported, but was distinct from, her job to sell advertisements.

With these factual matters unresolved, Facebook is not entitled to judgment as a matter of law based on the "directly related" criterion.

### 2. Duties That Include "Exercise of Discretion and Independent Judgment"

Factual issues also remain concerning whether Bigger customarily and regularly exercised discretion and independent judgment with respect to matters of significance. *See* 29 C.F.R. § 541.200(a)(3).

Exercising discretion and independent judgment "implies that the employee has authority to make an independent

choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). But employees may satisfy this qualification "even if their decisions or recommendations are reviewed at a higher level." *Id.* Agency regulations list factors to consider, including:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; … whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; … whether the employee provides consultation or expert advice to management; [and] whether the employee is involved in planning long- or short-term business objectives ….

*Id.* § 541.202(b). The regulations continue that exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).

Facebook contends that, in Bigger's work with clients and internal experts, she was expected to perform duties "with a significant amount of autonomy and independence." Bigger responds that in these duties, she merely took direction from clients and her supervisor, and implemented prescribed steps from manuals, scripts, and templates.

Testifying about her duties that appear to be the same ones Facebook contends involve discretion and independent judgment, Bigger explained that she essentially relayed information and followed outlined instructions or troubleshooting guides. She further explained that her recommendations to

clients were based on reports generated by Facebook's analytical tools after she plugged data into them; and her recommendations were either transmitted from other Facebook teams or had to be reviewed and accepted by her manager and client partner.

With this evidence in the record, and viewing all facts in the light most favorable to Bigger, we cannot conclude that, as a matter of law, Bigger customarily and regularly did more than apply well-established techniques, procedures, or specific standards prescribed by Facebook.

In sum, the submitted evidence does not establish all the facts necessary to determine whether Bigger fits the administrative exemption. Facebook is therefore not entitled to summary judgment.

### III. CONCLUSION

We AFFIRM the district court's denial of summary judgment to Facebook. But we VACATE the order authorizing notice, and we REMAND for the court to apply the steps we've set out.